UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

REMUS SMITH,

                                        Petitioner,


               vs.

                                                          9:03-CV-1178
CALVIN WEST,                                             (J. McAvoy)
Superintendent of Elmira Correctional Facility
                                        Respondent.

_____

REMUS SMITH, Petitioner *Pro Se*
LISA E. FLEISCHMANN, Assistant Attorney General for Respondent

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

     Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §

2254, challenging a judgment of conviction from the Onondaga County Supreme

Court.  Petitioner was convicted after a jury trial of Murder, Second Degree,

Attempted Murder, Second Degree, and Criminal Possession of a Weapon, Second

Degree, on March 19, 1999.  On July 15, 1999, petitioner was sentenced to an

indeterminate term of incarceration of twenty-five years to life on the murder charge,

and two indeterminate terms of three to six years incarceration on the attempted

murder and criminal possession of a weapon charges, all to be served consecutively.

In May 2001, the Appellate Division, Fourth Department granted petitioner's appeal and ordered a new trial on one of the issues raised by petitioner. *People v. Smith*, 283 A.D.2d 908, 730 N.Y.S.2d 583 (4ᵗʰ Dep't. 2001). The prosecution appealed, and the New York Court of Appeals reversed the Appellate Division decision, remitting the case to the Fourth Department for consideration of the remaining issues raised by petitioner in his original appeal. *People v. Smith*, 97 N.Y.2d 324; 766 N.E.2d 941 (2002). In May 2002, the Fourth Department modified petitioner's sentences to run concurrently, but affirmed the conviction in all other respects. *People v. Smith*, 294 A.D.2d 822; 740 N.Y.S.2d 900 (4ᵗʰ Dep't. 2002). The Court of Appeals denied leave to appeal in February 2003. (State Court Records ("S.C.R.") 2210).

Petitioner filed this federal habeas corpus action in September 2003. (Dkt. No. 1). In June 2004, petitioner made a motion to stay the proceedings so the he could return to New York State Court to exhaust his state court remedies as to certain issues that he wished to pursue in his habeas corpus application. (Dkt. No. 7). This court granted petitioner's motion and stayed the proceedings. (Dkt. No. 10). In October 2004, petitioner filed a motion to vacate the judgment of the trial court pursuant to New York Criminal Procedure Law Section 440.10. The Onondaga County Supreme Court denied the motion to vacate in July 2005. Petitioner sought and was denied leave to appeal by the Appellate Division, Fourth Department. The

2

federal stay was lifted in December 2006.  (Dkt. No. 17).  Petitioner made a motion

to amend which was granted in part.  (Dkt. No. 27).  Petitioner filed the amended

petition in June 2007 (Dkt. No. 28).

Petitioner raises seven grounds in support of his amended petition.

1.  Petitioner's conviction was based upon insufficient evidence.  (Petition[1] ¶ 22(A)).

2.  Petitioner's confession was involuntary and illegally obtained.  (Petition ¶ 22(B)).

3.  Petitioner was not allowed to use evidence of the character of the decedent at trial.  (Petition ¶ 22(C)).

4.  Petitioner was denied the right to due process when, during deliberations, the jury was impermissibly given the statement of a non-testifying witness.  (Petition ¶ 22(D)).

5.  Petitioner was denied the right to due process when the trial court denied a motion for mistrial after the jury received the statement of the non-testifying witness. (Petition ¶ 22(E)).

6.  The prosecutor engaged in misconduct by using evidence illegally obtained by the Syracuse Police Department.  (Petition ¶ 22(F)).

7.  Petitioner's right to due process and a fair trial were violated "through the cummulative [sic] effects of these errors."  (Petition ¶ 22(G)).

Respondent filed his answer to the original petition and a memorandum of law,

together with the pertinent State Court Records ("S.C.R.") in January 2004.  (Dkt.

---

[1]The court cites to the amended petition at Docket Number 28.  At Paragraph 22, where the petitioner lists the claims on which he bases the petition, this petitioner wrote, " * See Attachment* " and "[C]", directing the reader to the attached Exhibit C.  Petitioner's Exhibit C lists seven claims identified with Roman numerals.  The court has re-identified each of the claims with a letter (A - G) as prescribed by Paragraph 22 of the petition.  Therefore, the claim at Petitioner's Exhibit C, Roman numeral "I" is re-identified as "Petition ¶ 22(A)".

No. 6).  After the amended petition was filed, respondent filed a Supplemental

Answer (Dkt. No. 32) and a second memorandum of law (Dkt. No. 33) with

additional State Court Records (Dkt. No. 34) (*also* "S.C.R.")[2].

## DISCUSSION

### 1.  Facts and Procedural Background

#### A. The Shooting & The Confession

On August 30, 1998, an individual shot at two men in a parked car on Burt

Street in Syracuse, New York.  One of the men, Malik Robertson, was grazed by at

least one bullet (T.[3] 411-12), and the other man, Robert Drummond, was killed by a

gunshot wound to his head (T. 779).  Eyewitnesses reported that the shooter wore a

mask and a black "hoodie" or hooded sweatshirt.  (T. 381-82, 406-07, 414, 553).

Eyewitnesses stated that the shooter rode a bicycle to the rear of the car, where he

fired a gun multiple times, and then left the scene on the bicycle.  (T. 381-82, 407,

548-49).

The shooting occurred outside of an "after-hours" reggae party in the 200

---

[2]The original State Court Records submitted in January 2004 were identified by lettered exhibits.  The last exhibit was "AA".  The State Court Records submitted in November 2007 were also identified by lettered exhibits, and the group of exhibits began with "BB".  Because the later group of State Court Records is identified in consecutive letter order, the court will cite only to the exhibit title, and will not cite to the State Court Record's place on the docket.

[3]The three volume trial transcript is included in the State Court Records as Exhibits E, F, G, and is "Bates-stamped" accordingly.  To clarify that the court is citing to the trial transcript as opposed to some other State Court Record, the court will cite directly to the trial transcript as "T." and will use the original page numbering in the trial transcript.  For other State Court Records, the court will cite to the Exhibit and page, or directly to the S.C.R. page.

4

block of Burt Street at approximately 4:30 a.m. (T. 320, 324, 335). It is unclear how many people attended the party, but after the shooting, at least thirty to forty people remained on the scene. (T. 325). A police officer, responding to an unrelated call, was inside of an apartment building in the 300 block of Burt Street when he heard "[e]ight to ten shots fired rapidly." (T. 320-21). From his position on the eighth floor of the apartment building, the officer watched the aftermath of the shooting, including two people running away from the scene, and one person leaving the scene on a bicycle. (T. 324-25).

Malik Robertson was one of the victims of the shooting. Mr. Robertson testified that prior to the incident, he was near South Avenue and needed a ride home. (T. 402). Robert Drummond, the second victim, volunteered to give Mr. Robertson a ride home. (T. 403-04). The two men stopped at a burger place, and eventually stopped on Burt Street across the street from a party on their way to Mr. Robertson's residence. (T. 404). According to Mr. Robertson, he saw "a person all black on a bike . . . [and] just reacted" by quickly climbing into the back seat of the car. (T. 406-07). The shots began as Mr. Robertson was climbing over the seat. (T. 407).

When the shooting stopped, Mr. Robertson ran towards the party, asking for help to get away from the scene. (T. 408-09). Before he got out of the car, Mr. Robertson noticed that Mr. Drummond's head was down. (T. 408). Mr. Robertson

eventually got a ride from an acquaintance, and left the scene.  (T. 408).  Mr.

Roberton was grazed by a bullet, but did not seek any medical treatment for his

wound.  (T. 413-14).  Mr. Robertson did not learn that Mr. Drummond had been

fatally hit until the following day, when Mr. Robertson voluntarily reported to the

Syracuse Police Department's Criminal Investigation Division for questioning.  (T.

409).

        The first police officer arrived at the scene at approximately 4:37 a.m.  (T.

336).  When he arrived, there were "a lot of people running in every direction.  There

was [sic] cars fleeing the area . . . There was the person on a bicycle down

Montgomery I believe it was right down the middle of the street just riding down the

street.  It was confusion what [sic] I saw."  (T. 336-37).  The officer approached the

car, and inside, he saw an older black man who had been shot in the back of the head.

(T. 337).  The officer found a faint pulse and called for an ambulance.  (T. 338).  Mr.

Drummond was taken by ambulance to University Hospital.  (T. 353-54).

        After Mr. Drummond was taken to the hospital, police investigated the scene.

A tool mark and firearms expert testified that he found nine cartridge casings from

two different caliber weapons.  (T. 720-21).  The detective concluded that one

weapon, a nine millimeter Glock, fired eight of the cartridge casings.  (T. 709, 738,

751).  At trial, the detective agreed that all of the evidence "found within the vehicle

[was] consistent with one type of ammunition".  (T. 728).  The one remaining

cartridge casing, a forty-five caliber jacket found outside of the vehicle, was not connected to any of the points of impact on or inside of the vehicle.  (T. 728-29).  The detective concluded the forty-five caliber jacket "did not have anything to do with this crime scene."  (T. 729).

Police questioned several individuals during their investigation of the shooting.  Petitioner was questioned on two separate occasions, once on the day after the shooting (T. 524, 825-26), and again on September 1, 1998 (T. 524, 828-29).  Petitioner testified at trial that he was advised of his rights the first time he was interviewed by police.  (T. 827).  The next morning, three police officers went to petitioner's residence and asked him to accompany them to the office of the Criminal Investigation Division ("CID").  (T. 524-25).  Detective Mark Abraham testified at trial that petitioner was not handcuffed, and that the car was not locked during the trip to CID.  (T. 525).  Petitioner testified that he was handcuffed while he was transported to CID.  (T. 829).

Detective Abraham testified at trial that his partner read petitioner his *Miranda*[4] rights, and that petitioner "stated that he'd be willing to speak with us."  (T. 526).  Detective Abraham stated that his questioning of petitioner lasted from 7:15 a.m. until approximately noon.  (T. 530).  During that time, Detective Abraham testified that they took breaks for about ten minutes each hour.  (T. 530).  According

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

7

to Detective Abraham, he escorted petitioner to the bathroom twice, and petitioner declined offers of food and drink.  (T. 531).  Detective Abraham ended the interview prior to noon because "[w]e never did build a good rapport back and forth with him." (T. 532).

Detective Robert Teater began questioning petitioner at 12:30 p.m.  (T. 585). Detective Teater offered petitioner several choices of drink, and petitioner asked for water.  (T. 585).  Detective Teater read the *Miranda* rights, and petitioner stated that "he understood his rights and the other officers, the other detectives already read his rights to him, it wasn't necessary."  (T. 585-86).  Detective Teater "advised [petitioner] that we had affidavits from people that said that Remus had done the shooting. . .  He told me he wasn't even down in the area."  (T. 588).  After another break, Detective Teater told petitioner that an individual named Robert Hunt was also at CID.  (T. 589).  At that point, petitioner began crying.  (T. 590).  Petitioner asked about possible punishments, and eventually stated, "I let a lot of people down." (T. 590).  Detective Teater took another break, and resumed questioning petitioner around 2:30 p.m.  (T. 590).  After talking for a short period of time, "Remus told me that he had shot Mr. Drummond but he wasn't trying to shoot Mr. Drummond, he was trying to shoot Malik Robertson."  (T. 591).  Petitioner stated that he threw the gun, a nine millimeter Glock, into a pond in Upper Onondaga Park, and drew a map of the park and the pond.  (T. 591-92).

Detective Teater then took out a sheet with the *Miranda* rights on it, and petitioner wrote his initials beside each of the rights. (T. 597). Shortly after 3 p.m., Detective Teater's partner, Detective Quatrone, typed petitioner's statement as petitioner continued to respond to the detectives' questions. (T. 600). Around the same time, the detectives asked petitioner if he wanted anything to eat, and the detectives arranged for a meal to be brought from Burger King. (T. 600-01). The detectives finished taking the statement at 4:52 p.m. (T. 602). During the time that the statement was being typed, petitioner ate and went to the bathroom. (T. 600). Also during the time period that the statement was being given, petitioner drew a second map of the area where the shooting took place, and of his route during the incident. (T. 605).

When the statement was finished, petitioner read the statement, initialed some typographical errors, wrote "I've read this and it is the truth" at the end of the statement, and then signed the document. (T. 604). The detectives then took petitioner to the crime laboratory to see if petitioner could identify the bicycle he used out of several bicycles that were found in the area of the shooting. (T. 606-07). Petitioner identified one of the bicycles as the one that he used during the shooting. (T. 607). The detectives asked if petitioner would accompany them to Onondaga Park to show the detectives where petitioner had discarded the gun. (T. 608). Petitioner agreed, and showed the detectives where he stood when he threw the

weapon into the pond.  (T. 609).  The detectives and petitioner then returned to CID. (T. 609).  Petitioner consented to the detectives' request to videotape petitioner's confession.  (T. 609-10).  The recording lasted four minutes.  (T. 611).

Shortly before 6 p.m., the detectives became aware that petitioner's mother was at the CID office.  (T. 611).  They informed her that petitioner had confessed, and that he would be arrested.  (T. 612).  The detectives allowed petitioner's mother to see petitioner, and Detective Teater stayed just outside of the door.  (T. 613). Detective Teater overheard the petitioner's conversation with his mother.  Based upon that conversation, petitioner was questioned again, beginning around 7:40 p.m. (T. 613).  They asked petitioner if Abraham Whaley was with petitioner and if Whaley participated in the shooting.  Petitioner stated, "I shot into the car by myself. Abraham Whaley was not with me."  (T. 614).

### B.  The Trial and Jury Deliberations

Petitioner's trial took place over several days in late February and early March 1999.  The first two eyewitnesses testified about the man on the bicycle and his appearance, but were unable to identify the individual.  (T. 376-87, 388-400).  Malik Robertson, one of the victims, testified that he saw the man on the bicycle, but did not identify him.  (T. 406-07).  Mr. Robertson testified that he knew petitioner, and that they had been in a fight in the past.  (T. 415).  Mr. Robertson also testified about two groups of boys called "1-10" and "Bricktown."  (T. 415-16).  Mr. Robertson

testified that he associated with "1-10," and that the two groups were in conflict with each other after the stabbing death of another individual.  (T. 417-18).  Mr. Robertson stated that he was not paying attention to his location on the night of the shooting ("I just didn't think of it"), but that the 200 block of Burt street was approximately one or two blocks away from the "Bricktown" neighborhood.  (T. 425-28).

The next two witnesses were Abraham Whaley and Michael Walker.  They previously gave statements to police and testified before the grand jury that petitioner was the shooter.  At trial, both recanted their prior statements to police and sworn testimony to the grand jury.  Abraham Whaley, a childhood friend of petitioner's, testified at trial that he went to the area of the party on Burt Street with petitioner, but did not go to the party.  (T. 441).  Mr. Whaley stated that he "heard that people from the 1-10 was riding through."  (T. 445).  Mr. Whaley testified that he heard that Malik Robertson was in the area around the party, and he knew Mr. Robertson to be associated with "1-10."  (T. 448-49).  Mr. Whaley then stated that the police "scared me into signing this statement," and that Mr. Whaley did not see petitioner get on a bicycle, or shoot at anyone.  (T. 451-56).  When the prosecutor confronted Mr. Whaley with his signed statement to police, the trial court found Mr. Whaley in criminal contempt of court for his "contumacious" testimony and failure "to answer a properly phrased question."  The judge sentenced Mr. Whaley to two consecutive

sentences of thirty days.  (T. 458-59).

The prosecutor then continued to question of Mr. Whaley regarding his prior signed statement to police.  Mr. Whaley told police that he saw petitioner riding a bicycle towards the car in which the victims were sitting, and then saw petitioner raise his right hand and begin firing a gun.  (T. 463-64).  Mr. Whaley stated that he remembered petitioner telling him that "he thought he hit someone in the car."  (T. 470-71).  Mr. Whaley also stated that petitioner was wearing a dark colored "hoodie."  *Id*.  At trial, Mr. Whaley disputed most of the details in the prior statement, and said that he had been threatened with criminal charges, including an accessory charge, if he did not state that petitioner was the shooter.  (T. 474-75, 479).  Mr. Whaley also testified that police poked him in the chest, and that one of the detectives "slapped me on my arm, told me to get ready for the lethal injection."  (T. 475-76).

The next eyewitness, Michael Walker, a friend of petitioner's, also recanted a prior statement to police as well as sworn testimony in front of a grand jury.  Mr. Walker's statements to the police and the grand jury included statements that Mr. Walker saw petitioner riding a bicycle, holding a gun, and shooting at the car.  (T. 506-07, 520-21). Mr. Walker testified at trial that his back was turned to the scene of the shooting, and that he did not see who fired the shots.  (T. 499).  Mr. Walker testified that he signed the statement to police because "they told me if I didn't sign

this statement, I wasn't going home . . ." (T. 501).  Mr. Walker also testified that

when he testified before the grand jury, the prosecutor told him "I got to say what's

on the statement or I would perjury [sic] myself."  (T. 512).

   The last eyewitness for the prosecution, Robert Hunt, was also a longtime

friend of petitioner's.  (T. 542).  He attended the August 30 party with Michael

Walker and Dewitt Rohadafox, among others (T. 543), and witnessed the man on the

bicycle shooting at the car on Burt Street (T. 548).  Mr. Hunt testified that in the five

or ten minutes before the shooting, Dewitt Rohadafox asked to borrow Mr. Hunt's

hooded sweatshirt, and then said, "[w]atch how this whole thing goes down."  (T.

547).  Mr. Hunt testified that petitioner was the shooter.  (T. 548).  Mr. Hunt testified

that he saw petitioner after the shooting, and that petitioner asked if anyone in the car

had been hit.  (T. 551).  Mr. Hunt testified that petitioner stayed with him that night,

and that he kept watch while petitioner slept.  (T. 552).

   On cross-examination, Mr. Hunt admitted that he was currently on probation

for a burglary charge, and faced a violation of probation charge if he did not

cooperate with the investigation.  (T. 556).  Mr. Hunt also admitted that he testified

to the grand jury that he did not know who did the shooting.  (T. 571).  Defense

counsel also asked Mr. Hunt about a conversation with another individual, during

which Mr. Hunt stated that he "knew Remus didn't do it but that [he was] going to

come down here and do what [he] had to do because [he has] a baby and because [he

was] on probation." (T. 574). Mr. Hunt admitted that the conversation took place as described by counsel. (T. 574).

On re-direct examination, Mr. Hunt stated that he was not testifying because of his baby (T. 575), and that he knew petitioner was the shooter "[b]ecause I know his body, what he looks like and he is a good friend of mine so I pretty much, I've known him for a long time" (T. 576). Mr. Hunt also testified that even though he initially told the grand jury that he did not know who the shooter was, he later told the grand jury that he saw the shooting, and that petitioner was the shooter. (T. 576-78). He stated that he was scared and "had the jitters" when he first testified in front of the grand jury. (T. 579).

The only other eyewitness to testify, besides petitioner, was Dewitt Rohadafox, who testified for the defense. (T. 784-817). Mr. Rohadafox testified that on the night of the shooting, he saw Abraham Whaley dressed in a black hoodie, a black pair of jeans, and black boots. (T. 791). He stated that as he was crossing the street "I just seen someone, I just seen a person come from right on the side where Abraham was at on a bike and then I just seen, I just seen they had on the same thing Abraham Whaley had on and I just seen them firing some shots into a car." (T. 791). Mr. Rohadafox testified that police questioned him several times, and that after a particularly lengthy interrogation where he had not eaten and was falling asleep during the questioning, Mr. Rohadafox eventually signed a statement, claiming that

14

he saw petitioner at the party.  (T. 797-99).  On cross-examination, Mr. Rohadafox acknowledged that in his statement to police, he stated that he did not see the shooting.  (T. 806-07).  Mr. Rohadafox also acknowledged that he did not include information about Abraham Whaley's clothing in his statement to the police, or in his sworn testimony to the grand jury.  (T. 809-10).

Petitioner testified in his own defense.  (T. 818-914).  Petitioner testified that he left the party around one a.m. with Abraham Whaley.  (T. 823).  Petitioner testified that they got a ride home from another friend, Michelle Fudge, and that on the way home, the trio stopped for food at Sabatino's.  (T. 823).  Petitioner stated that when he woke up the next morning, Abraham Whaley had already left petitioner's house.  (T. 824).  Petitioner testified that he was not present for the shooting, did not participate in it, and was home asleep when the shooting occurred. (T. 824-25).  Petitioner testified that he was advised of his rights during the first time that police interrogated him.  (T. 827).

Petitioner testified that when police came to his home for a second round of interrogation, he was handcuffed for the ride to CID. (T. 829-30).  Petitioner also testified that he was handcuffed during the entire period of questioning by Detective Abraham.  (T. 833, 838).  Petitioner testified that he asked for his lawyer approximately five times.  (T. 831-32, 834, 835).  Petitioner acknowledged that the *Miranda* rights were read early in the questioning.  (T. 835-36).  Petitioner also

acknowledged that he did not ask for food or drink during the time that Detective Abraham conducted the questioning.  (T. 836-37).  Petitioner testified that he did not need to go to the bathroom during that time.  (T. 838).

Petitioner testified that during the questioning, he fell asleep a couple of times. (T. 837).  When Detective Teater began questioning petitioner, petitioner testified that the detective tried to make small talk, and mentioned the possibility of a trial. (T. 839-40).  Eventually, Detective Teater told petitioner that other individuals implicated petitioner in the shooting.  (T. 840-41).  Petitioner testified that Detective Teater advised petitioner of his rights, but that petitioner could not remember exactly when that happened.  (T. 841-42).  Petitioner testified that he asked Detective Teater for a lawyer when Detective Teater began asking about the shooting.  (T. 842). According to petitioner, Detective Teater yelled at petitioner, and petitioner began crying.  (T. 844).  They took a break from the questioning.  (T. 844-45).  Petitioner testified that he never stated that he had "let a lot of people down."  (T. 845-46). Petitioner stated that he repeatedly asked Detectives Teater and Quatrone for his lawyer.  (T. 849, 867).

Petitioner testified that he asked for food, and Detective Teater told him "[l]isten, I'll give you something to eat if you make a statement."  (T. 852). According to petitioner, Detective Teater stated that petitioner would not get anything to eat until petitioner made a statement.  (T. 852).  At that point, petitioner

was tired and hungry, and "then [he] just, I answered the questions yes."  (T. 854).

Petitioner testified that Detective Quatrone was already typing the statement, and that

whenever petitioner was asked a question, he answered yes.  (T. 853-54).  Petitioner

testified that initially he told police that he did not own a gun, but that "[a]fter the

time they told me to correct my answer . . . I said yes."  (T. 855-56).  Petitioner

testified that he had a "little fight" with Malik Robertson "a long time ago," but that

he did not have a dispute with him at the time of the shooting.  (T. 859-62).

Petitioner testified that he did not know of a gang called "Bricktown."  (T. 863-64).

With respect to the drawing of the pond, petitioner testified that "I never been to this

lake.  I never been to this side of town or lake. . . . [The detectives] [j]ust told me to

draw a pond.  I drew a pond."  (T. 885).  With respect to the map of petitioner's route

before and after the shooting, petitioner testified that "they thought I was lying about

that I knew where [the party was] at so they asked me to draw it to verify that I know

where it's at."  (T. 886).  Petitioner denied owning a gun (T. 887), and testified that

he did not have a conversation with his mother after signing his statement (T. 887-

88).

        Before the defense rested, defense counsel made an offer of proof related to a

small amount of drugs found in victim Robert Drummond's wallet.  (T. 874).

Defense counsel stated that this evidence was relevant because it could indicate a

drug transaction around the time of the shooting, raising the possibility of another

motive for the shooting.  (T. 876-77).  The court denied the defense request to

introduce evidence related to the drugs.  (T. 883).

After summations, the jury was charged and began deliberations on the

afternoon of March 1, 1999.  After a few hours of deliberations, the jury sent a note

to the judge regarding Exhibit 39.  (T. 1027-28).  The note stated, "[w]e have a copy

of Michelle Fudge's statement to the police which is on the back of Exhibit 39.  Are

we supposed to have it?"  (T. 1028).  The judge read the note in open court, and

stated

> "Well, the answer to that question, of course, is no, but the record
> should reflect that two, well, three lawyers, I'm still a lawyer, three
> lawyers looked at this and it completely missed us that there was
> something on the back of Exhibit 39.  Exhibit 39 was received as a
> memorandum past recollection recorded of the notes of Detective Teater
> regarding certain landmark events during the course of the
> interrogation."

(T. 1028).  Defense counsel agreed with the court's finding that no one had any

intention of sharing this non-witness statement with the jury.  However, defense

counsel still moved for a mistrial.  (T. 1028-30).

The basis for the mistrial motion was that Ms. Fudge's statement to the police

directly contradicted petitioner's version of events on the night of the shooting.  (T.

1029-30).  Specifically, according to defense counsel, Ms. Fudge stated

> "that at no time on the night of August 30 or morning of August 30 did
> she give anyone or give [petitioner] a ride and indicated . . . that she had
> given him a ride at some previous time, at which time they had stopped
> to eat at Sabastino's . . . a couple of weeks prior to the time she gave the

statement."

(T. 1029-30).  The prosecution opposed the motion and argued that a curative instruction would suffice.  (T. 1030-31).

The judge denied the motion for a mistrial.  (T. 1031).  The judge gave what he described as a "very vehement curative instruction" (T. 1031) that described the note as hearsay, and instructed the jury "to disregard it in its entirety" (T. 1034).  The judge polled the jury to find out who had read the statement.  Though the exact number of jurors who read the statement is unclear, it is apparent that at most, six jurors read the statement.  (T. 1035-36).  On March 1, 1999, the jury convicted petitioner of second degree murder, attempted second degree murder, and second degree criminal possession of a weapon.  (T. 1051-52).

### C.  Post-Conviction Proceedings

Petitioner appealed his conviction to the Appellate Division, Fourth Department on several grounds, including an allegation that the trial court erred when it denied petitioner's motion for a mistrial after members of the jury read Michelle Fudge's statement.  (S.C.R. 1446-1448).  The Appellate Division overturned the conviction and granted a new trial.  *People v. Smith*, 283 A.D.2d 908, 909,  730 N.Y.S.2d 583 (4th Dep't, 2001).  The Appellate Division found a violation of petitioner's right to confront the witnesses against him, and found "that the prejudicial effect upon the jury was not alleviated by the instruction."  *People v.*

*Smith*, 283 A.D.2d at 909.  The Appellate Division stated "that there is a reasonable possibility that the error might have contributed to [petitioner's] conviction, and thus the error is not harmless beyond a reasonable doubt."  *Id*.  Two of the Appellate Division judges dissented, and argued that the error was "harmless beyond a reasonable doubt."  *Id*. at 910.  The dissenting judges stated the petitioner's sentence should be modified so that the sentences would run concurrently.  *Id*. at 909-10.

The prosecution appealed the Appellate Division decision to the New York Court of Appeals.  The Court of Appeals reversed the Fourth Department, and remitted petitioner's appeal to the Fourth Department for consideration of petitioner's remaining claims.  *People v. Smith*, 97 N.Y.2d 324; 766 N.E.2d 941 (2002).  The Court of Appeals stated that

> there is no reasonable possibility that the error might have contributed to [petitioner's] conviction because proof of [petitioner's] guilt, without reference to the error, is overwhelming. . . On the whole record, including the curative instruction, the submission of Fudge's statement to the jury was harmless beyond a reasonable doubt.  The trial court did not abuse its discretion in denying [petitioner's] motion for a mistrial.

*People v. Smith*, 97 N.Y.2d at 330-31.  On remittitur, the Fourth Department modified petitioner's sentences so that all sentences would run concurrently, and found that petitioner's remaining contentions were without merit.  *People v. Smith*, 294 A.D.2d 822; 740 N.Y.S.2d 900 (4th Dep't, 2002).  The Court of Appeals denied leave to appeal in February 2003.  (S.C.R. 2210).  Respondent, in this case, concedes that all of petitioner's claims are exhausted.  (Dkt. No. 33, 5-7).

## 2.  Scope of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), claims

adjudicated on the merits in state court will stand

> unless the adjudication . . . (1) resulted in a decision that was contrary
> to, or involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United States;
> or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. 2254(d) (2007).  The Second Circuit describes this as a deferential review,

and states that

> the necessary predicate to this deferential review is, of course, that
> petitioner's federal claim has been adjudicated on the merits by the state
> court.  If a state court has not adjudicated the claim on the merits, we
> apply the pre-AEDPA standards, and review *de novo* the state court
> disposition of the petitioner's federal constitutional claims.

*Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*, 269

F.3d 78, 93 (2d Cir. 2001)).

"[A] state court adjudicates a petitioner's federal constitutional claims on the

merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition

to judgment."  *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (internal citations

omitted).  In order to determine whether a state court has disposed of a claim on the

merits, the following factors are considered: "(1) what the state courts have done in

similar cases; (2) whether the history of the case suggests that the state court was

aware of any ground for not adjudicating the case on the merits; and (3) whether the

state court's opinion suggests reliance upon procedural grounds rather than a

determination on the merits." *Aparicio*, 269 F.3d at 93 (quoting *Sellan v. Kuhlman*,

261 F.3d 303, 314 (2d Cir. 2001)).

> In this regard, we have given a broad reading to state court dispositions,
> noting that "a state court need only dispose of the petitioner's federal
> claim on substantive grounds, and reduce that disposition to judgment.
> No further articulation of its rationale or elucidation of its reasoning
> process is required." *Aparicio*, 269 F.3d at 93-94 (citing *Sellan*, 261
> F.3d at 312).  Furthermore, an issue raised may be considered
> adjudicated "on the merits" for AEDPA purposes even when the state
> court does not specifically mention the claim but uses general language
> referable to the merits.  *Aparicio*, 269 F.3d at 94; *Sellan*, 261 F.3d at
> 312-14.

*Norde*, 294 F.3d at 410.

In this case, the Appellate Division overturned petitioner's conviction because

of an "error," and did not address petitioner's other claims, "except to note that the

court properly denied [petitioner's] motion seeking to suppress his statement to

police, but erred in directing that the sentence[s] imposed . . . shall run consecutively

. . ." *People v. Smith*, 283 A.D.2d 908, 908-909 (4th Dep't 2001).  After that decision

was overturned by the Court of Appeals (*People v. Smith*, 97 N.Y.2d 324), the

Appellate Division again considered the claims in petitioner's appeal.  As described

above, the Appellate Division modified petitioner's sentences so that they would run

concurrently.  *People v. Smith*, 294 A.D.2d at 823.  The court went on to state that

"[w]e have reviewed [petitioner's] remaining contentions and conclude that they are

without merit."  *Id*.  While the Appellate Division did not list the other claims, or

explain its basis for dismissing the other claims, it is clear that the court dismissed the claims on the merits.

A state decision is "contrary to clearly established Federal law if it 'contradicts the governing law' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the Supreme Court." *Ramirez v. Miller*, 04 Civ. 2967, 2005 U.S. Dist. LEXIS 4306, *10 (S.D.N.Y. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). The "contrary to" standard requires not just an incorrect application of the law, but an *unreasonable* application. *Id*. "Objective unreasonableness includes an unreasonable refusal 'to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Id*. (quoting *Kennaugh v. Miller*, 289 F.3d 36, 45 and n.2 (2d Cir. 2002)).

Pursuant to 28 U.S.C. § 2254 (e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254 (e)(1) (2007). *See Sorto v. Herbert*, 364 F. Supp. 2d 240, 242 (E.D.N.Y., 2004). The Supreme Court held that "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."

*Schriro v. Landrigan*, 550 U.S. __, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (May 14, 2007).

### 3.  Insufficiency of Evidence

Petitioner's first claim is that there was insufficient evidence to establish his guilt.  (Petition ¶ 22(A)).  Petitioner did not submit a Memorandum of Law, and the specific basis for his claim in this court is unclear.  In his direct appeal to the Appellate Division, petitioner argued that the weight of the evidence did not support a conviction because no tests for gun residue were performed on the clothing petitioner wore on the night of the shooting, no gun was found where petitioner told police he had disposed of it, and eyewitness Robert Hunt was not credible.  (S.C.R. 1432).  With respect to petitioner's confession, petitioner argued in his direct appeal that his confession was involuntary and inaccurate.  (S.C.R. 1433).

In its decision, after discussing the sentencing issue, the Appellate Division held, without further analysis, that petitioner's "remaining contentions are without merit."  *People v. Smith*, 294 A.D.2d 822; 740 N.Y.S.2d 900 (4th Dep't, 2002).  A habeas petitioner challenging the sufficiency of the evidence bears "a very heavy burden."  *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quotation marks omitted); *Einaugler v. Supreme Court of New York*, 109 F.3d 836, 840 (2d Cir. 1997) (quotation marks omitted).  A habeas challenge to the sufficiency of the evidence "does not require a court to 'ask itself whether it believes that the evidence at the trial

established guilt beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (quoting *Woodby v. I.N.S.*, 385 U.S. 276, 282 (1966)).  Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19.  Thus, a habeas court must uphold a conviction unless, upon the record evidence adduced at trial, no rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt. *Id.  See Ponnapula*, 297 F.3d at 179 ("[W]e review the evidence in the light most favorable to the State and [hold that] the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.").

A person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N. Y. PENAL Law § 125.25 (1).  A person is also guilty of murder in the second degree when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person".  N. Y. PENAL Law § 125.25 (2).  In New York, a person is guilty of an attempt to commit a crime when "with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N. Y. PENAL Law § 110.00.  Finally, a person is "guilty

25

of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another: (1) he possesses a machine gun; or (2) he possess a loaded firearm; or (3) he possesses a disguised gun."  N. Y. PENAL LAW § 265.02.

In this case, the important facts are those relating to whether petitioner shot and killed Robert Drummond.  If petitioner was guilty of shooting Robert Drummond, then he was also guilty of shooting at Malik Robertson and possessing a gun.

The jury heard testimony from an eyewitness, petitioner's childhood friend Robert Hunt, who stated that he saw petitioner shoot into the car.  The jury also heard testimony from two additional eyewitnesses who recanted their statements that they witnessed petitioner do the shooting, but had testified to that effect on earlier occasions.  The two recanting prosecution eyewitnesses, Abraham Whaley and Michael Walker, previously told the police and the grand jury that they saw petitioner shoot at the car containing Mr. Drummond and Mr. Robertson.  Dewitt Rohadafox, the defense eyewitness who claimed that the shooter was absolutely not petitioner, had already told police that he did not witness the shooting.  The jury was able to consider petitioner's confession, along with testimony regarding the two maps that petitioner drew related to the shooting.  The jury also viewed petitioner's videotaped confession.  Petitioner testified, and the jury was able to consider his demeanor and credibility.  The jury heard several allegations regarding the behavior

26

of the police officers, and conflicting accounts of the circumstances surrounding petitioner's confession, as well as police treatment of other witnesses.

Based on the evidence at trial, a reasonable jury could have found petitioner guilty beyond a reasonable doubt.  There was evidence that petitioner attended the party where the shooting occurred.  There was evidence that petitioner had a motive for the shooting.  There was eyewitness testimony that petitioner shot at the car containing the victims.  Petitioner confessed to the shooting, identified the bicycle that he rode to and from the shooting, and told police what he did with the gun after the shooting.  Accordingly, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of second degree murder, attempted second degree murder, and second degree criminal possession of a weapon.  The New York appellate court did not apply Supreme Court precedent unreasonably or make a decision contrary to Supreme Court precedent. The claim may be dismissed.

## 4.  Involuntary Confession

Petitioner alleges a due process violation because his Fifth Amendment right against self-incrimination was "violated when his confession was involuntarily and illegally obtained."  (Petition ¶ 22(B).  Petitioner claimed that his confession was the result of "isolation, intimidation, physical deprivation, psychological pressure and misconduct . . ."  (S.C.R. 1440).  The Appellate Division found no merit to

petitioner's claim when it stated that petitioner's "remaining contentions are without merit." *People v. Smith*, 294 A.D. 2d at 822-23.  Based upon petitioner's allegations in his direct appeal, it appears that petitioner's claim in this court is that his confession was involuntary because of the totality of the circumstances under which the confession was obtained.

       To determine the voluntariness of a confession, "courts look to the totality of the circumstances . . ." *Withrow v. Williams*, 507 U.S. 680, 693 (1993).  In *Withrow*, the Supreme Court summarized potential circumstances that courts may consider: "police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health . . . [as well as] the failure of the police to advise the defendant of his rights . . ." *Id*. at 693-94 (internal citations omitted).  Under *Dickerson*, the Supreme Court explained that the analysis is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession[,]   . . . taking into consideration 'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

       In this case, petitioner makes no allegation that police officers failed to advise petitioner of his *Miranda* rights.  On direct examination at trial, petitioner acknowledged that he was advised of his rights on the two separate occasions he was

questioned.  (T. 827, 835-36).  On the second occasion, the result of which was

petitioner's confession, petitioner agreed that he was advised of his rights "at the

beginning" of Detective Whaley's interrogation.  (T. 835).  Petitioner seems to be

claiming that he was not capable of voluntarily waiving his *Miranda* rights because

of fatigue, hunger, and the psychological pressure from police that petitioner endured

during his questioning.[5],[6]

---

[5]In his Section 440 motion, petitioner alleged a constitutional violation because he was represented by an attorney on an unrelated matter when he was questioned after the shooting, and because when he asked for an attorney during the questioning, the police denied him the opportunity to consult an attorney.  Exhibit CC, 3.  With respect to petitioner's argument regarding his representation by counsel on another charge, the court notes that "a district court is 'limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.'"  *Beekman v. Lacy* 918 F. Supp. 57, 63 (N.D.N.Y. 1996) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  *See also* 28 U.S.C. § 2254(a).  The particular right to counsel that petitioner may be asserting here arises under New York law.  *Beekman*, 918 F. Supp. at 63.  In this area, it is well-settled that the New York rule is broader than the federal rule, and cannot be a basis for relief under 28 U.S.C. 2254.  *Id.  See also*, *Key v. Artuz*, 2002 U.S. Dist. LEXIS 17712, *12 (E.D.N.Y. 2002) (alleged Sixth Amendment violation based on representation on unrelated charge not cognizable on federal habeas review); *Ballew v. Walker*, 1999 U.S. Dist. LEXIS 22511, *11 (W.D.N.Y. 1999) (no "indelible" right to counsel based on representation on prior pending charge) (*citing United States v. Broccolo*, 797 F. Supp. 1185, 1196 (S.D.N.Y. 1992)).

In *Texas v. Cobb*, the Supreme Court stated that the "Sixth Amendment right to counsel is personal to the defendant and specific to the offense."  *Texas v. Cobb*, 532 U.S. 162, 172 (2001).  Even if petitioner had been represented on an unrelated, prior charge at the time he made his statements to police, it would not be a basis for claiming a violation of petitioner's federal Sixth Amendment right to counsel.  The federal rule permits the questioning of petitioner while he is represented on an unrelated charge.  *McNeil v. Wisconsin*, 501 U.S. 171 (1991).  Thus, to the extent that petitioner makes a possible Sixth Amendment claim based solely on New York law, the claim may be dismissed as non-cognizable.

[6]With respect to another possible claim in this court based on petitioner's claim in his Section 440 motion that he asked for an attorney repeatedly and was denied access to his attorney, the trial court addressed that issue in the ruling after the *Huntley* hearing, and found that petitioner's and his witnesses' testimony were not credible.  Petitioner did not raise this issue on direct appeal, and it is unclear whether he raises the issue in this proceeding.  As the Section 440 court noted, petitioner litigated issues surrounding his confession "extensively in the trial court" (Exhibit FF, 4).  Because he did not raise this particular issue related to his confession on his direct appeal, the issue is procedurally defaulted.  If he intended to raise this claim, he should have raised it on his direct appeal.  Since it is unclear whether petitioner intends to raise this

Prior to trial, petitioner participated in a *Huntley*[7] hearing.  After the *Huntley* hearing, the judge ruled that the prosecution proved "beyond a reasonable doubt that [petitioner] was given his *Miranda* warnings and that [petitioner] understood his rights and knowingly, intelligently and voluntarily waived his rights . . . on September 1, 1998 immediately prior to his giving the written statement."  Exhibit DD, 24.  The judge ruled that petitioner's oral and written statements to police were voluntary and admissible.  *Id.*  After a lengthy recitation of the testimony given at the hearing, the judge made findings of fact.  Among the findings of fact made by the judge with respect to petitioner's interrogation and confession were "that the testimony of the police witnesses was entirely credible and the testimony of the witness called by Defendant was not credible."  *Id*. at 21.  The court found that petitioner's statement at the *Huntley* hearing, "I sacrificed my life for a Whopper and a soda," (S.C.R. 293) was "simply incredible on its face" (Exhibit DD, 23).  The court also stated

> [c]ontrary to the allegations contained in [petitioner's] motion to
> suppress which claim [petitioner] was "relativity [sic] unsophisticated in
> matters such as these," the testimony and evidence showed the

issue in this court, the court will forego a more lengthy analysis, but petitioner has suggested no cause for the default of this issue, and the court need not decide whether petitioner has been prejudiced by the default.  *Coleman v. Thompson*, 501 U.S. 722, 748-50 (1991).  Furthermore, no miscarriage of justice would result from the court's failure to consider this issue as petitioner has submitted no evidence of "actual innocence."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To the extent that petitioner may be raising the issue that he asked for an attorney during questioning, but was not granted one, the claim may be dismissed.

[7]*People v. Huntley*, 15 N.Y. 2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 173 (1965).

> [petitioner] was fully capable of understanding and in fact did
> understand his rights. [Petitioner] offered no evidence whatsoever that
> he lacked the ability to understand his rights as they were explained to
> him.  The court finds that [petitioner's] contention that he was tired and
> hungry to such an extent he could not voluntarily waive his rights is not
> supported by credible evidence.  The Court further finds that
> [petitioner's] allegations that he made incriminating, oral statements and
> a written statement as a result of promises and threats by the Syracuse
> Police Department are without merit.

*Id*. at 21-22.

The court evaluated the credibility of the witnesses, found that petitioner understood his rights, and voluntarily waived them.  The court also considered the number of breaks taken during the interrogation, as well as when petitioner was provided food and drink.  In deciding that petitioner's statements to police were admissible, the judge considered the totality of the circumstances under which petitioner's statements were given.  That determination, along with the trial court's eventual admission of the statements and the New York appellate courts' affirmation of the admission, are consistent with the Supreme Court's clearly established precedent.  In this case, there was no unreasonable determination of the facts surrounding the circumstances of petitioner's confession.  The jury heard testimony regarding the circumstances under which petitioner's statements were obtained, and made credibility determinations on that basis.  The claim may be dismissed.

**5.  <u>Evidentiary Ruling Claim</u>**

Petitioner claims that "the trial court denied him the right to present a defense

when it refused to allow him the use of character evidence against the decedent."

(Petition ¶ 22(C)).  The character evidence that petitioner's counsel attempted to

introduce into evidence was the presence of a small amount of drugs found in Robert

Drummond's wallet.  (T. 874).  Petitioner's counsel made an offer of proof.  (T. 874-

77).  Defense counsel explained that the evidence was relevant because it could

indicate to the jury that the motive for the shooting could have been related to a drug

transaction.  (T. 876-77).  The evidence was excluded by the trial judge.  (T. 883).

Under *Crane v. Kentucky*, "the Constitution guarantees criminal defendants a

'meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476

U.S. 683, 690, 106 S. Ct. 2142 (1986).  However, the Supreme Court also

acknowledged its "traditional reluctance to impose constitutional restraints on

ordinary evidentiary rulings by state trial courts."  *Crane*, 476 U.S. at 689.  The

Second Circuit held that "[r]estrictions on a defendant's presentation of evidence are

constitutional if they serve 'legitimate interests in the criminal trial process . . .'"

*United States v. Almonte*, 956 F.2d 27, 20 (2d Cir. 1992) (quoting *Rock v. Arkansas*,

483 U.S. 44, 55-56, 107 S. Ct. 2704 (1987)).

A defendant must comply with established rules of procedure and evidence,

and does not have an unlimited right to introduce evidence or testimony that is

"'incompetent, privileged, or otherwise inadmissible under standard rules of

evidence.'" *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (quoting *Taylor v.*

*Illinois*, 484 U.S. 400, 410 (1988). However, state evidentiary rules may not be

applied rigidly, prohibiting the presentation of exculpatory evidence. *Hawkins*, 460

F.3d at 243 (citing *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003)).

In considering whether the exclusion of evidence violated the petitioner's

constitutional rights, the court must begin by examining the propriety of the

evidentiary ruling. *Id*. at 244 (citing *inter alia*, *Wade*, 333 F.3d at 59). The

erroneous exclusion of evidence violates the defendant's right only if the evidence in

question "creates a reasonable doubt that did not otherwise exist" as evaluated "in

the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).

However, a constitutional violation also occurs if the evidence was properly

excluded under state law, but pursuant to a rule that is "arbitrary" or

"disproportionate to" the purposes that the rule is intended to serve. *Hawkins*, 460

F.3d at 244 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

> A state evidentiary rule is unconstitutionally arbitrary or
> disproportionate only where it has infringed upon a weighty interest of
> the accused. Moreover, even before AEDPA required a more
> deferential review, the Supreme Court had a traditional reluctance to
> impose constitutional constraints on ordinary evidentiary rulings by
> state trial courts. The court has never questioned the power of States to
> exclude evidence through the application of evidentiary rules that
> themselves serve the interests of fairness and reliability - even if the
> defendant would prefer to see that evidence admitted.

*Id*. at 244 (internal citations omitted).

In making his ruling, the trial judge found three possible reasons for the

proffer: to impeach the victim Robert Drummond, to impeach other witnesses, or to contradict the prosecution's theory of the case. (T. 879-80). The trial judge stated that

> It seems to me that this evidence would be, would require an inference upon an inference, something that's not allowed in the law. It would require in order for you to make anything of it in summation wild speculation, which is another thing that is not allowable and the jury is told not to do.

(T. 882). The trial judge ruled that the defense could not introduce the evidence because the evidence was too speculative to contradict the prosecution's version of the case.

First, the court must address the propriety of the ruling by the trial court. As the trial court did not rely on a particular evidentiary rule when it excluded the evidence, this court will not analyze a particular rule, but will address whether the excluded evidence would have created a reasonable doubt. The court finds that to the extent that an error of state evidentiary law could have occurred, admission of the excluded evidence would not have created a reasonable doubt that did not otherwise exist. *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996); *Agurs*, 427 U.S. at 112. Admission of evidence tending to show that petitioner may not have been the only individual at the party to have a motive for the shooting, or that the shooting was somehow drug related, would not have created a reasonable doubt as to petitioner. In fact, in light of the testimony regarding the two "groups of boys" who lived in

different neighborhoods and who did not get along, evidence regarding drug involvement may not have raised any doubt, much less a reasonable doubt, as to petitioner's guilt in the minds of the jurors.

Next, the court must examine the application of the state evidentiary rules in this case.  The trial court did not rely on a particular evidentiary rule when it excluded the evidence, but rather properly relied on its general discretion and the general principles of New York evidence rules.  This court cannot find that petitioner's "weighty interests" were implicated to any degree by this ruling.  The evidence of a small amount drugs found on Mr. Drummond's person could not and did not exculpate petitioner in any way.  The evidence may have cast some shadow on the character of the deceased, but not in a way that would necessarily benefit petitioner.  Here, there is simply no basis to find that the application of New York's rules of evidence infringed on any of petitioner's weighty interests.  The state courts did not arrive at a conclusion of law contrary to one reached by the Supreme Court, nor did it reach a result different from one reached by the Supreme Court on materially indistinguishable facts.  The claim may be dismissed.

## 6.  **Confrontation**

Two of petitioner's claims allege due process violations because several jurors read Michelle Fudge's statement to police, essentially viewing the statement of a non-testifying witness, without benefit of cross-examination.  One of petitioner's two

claims on the subject allege that this was error and resulted in a constitutional

violation.  The other claim alleges a constitutional violation because the trial court

failed to grant a mistrial after the error occurred.  These two claims are essentially the

same.  Michelle Fudge's statement was not introduced into evidence, and its

existence was not referred to in any way during the proof presented to the jury.  The

admissibility of Michelle Fudge's statement is not in question.

The Confrontation Clause of the Sixth Amendment requires that an accused

"be confronted with the witnesses against him."  U.S. CONST. amend VI.  The Sixth

Amendment and the Confrontation Clause are applicable in state criminal trials under

the Fourteenth Amendment.  U.S. CONST. amend XIV; *Douglas v. Alabama*, 380

U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965).  "The primary purpose of the

Confrontation Clause is to prevent out-of-court statements from being used against a

criminal defendant in lieu of in-court testimony subject to the scrutiny of cross-

examination."  *A.S. Goldmen, Inc. v. Phillips*, 05 Civ. 4385, 05 Civ. 5496, 2006 U.S.

Dist. LEXIS 45342, *106 (S.D.N.Y. July 6, 2006) (citing *Douglas v. Alabama*, 380

U.S. at 418-19; and *Crawford v. Washington*, 541 U.S. 36, 68-69, 124 S. Ct. 1354

(2004)).

Violations of the Confrontation Clause are subject to harmless-error review.

*United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006).  The Supreme Court held

> that in § 2254 proceedings a court must assess the prejudicial impact of
> constitutional error in a state-court criminal trial under the "substantial

and injurious effect" standard set forth in *Brecht*[8] . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[9] . . .

*Fry v. Pliler*, ___ U.S. ___, 127 S. Ct. 2321, 2328, 168 L. Ed. 2d 16, 24 (June 11, 2007).  *Brecht* requires that a petitioner show that he suffered actual prejudice because of the trial error.  *Brecht*, 507 U.S. at 637 (internal citations omitted).

Prior to *Fry*, the relevant standard under AEDPA was *Mitchell v. Esparza*, which required that "when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  *Fry*, 127 S. Ct. at 2326 (citing *Mitchell v. Esparza*, 540 U.S. 12 (2003)).  Under *Chapman*, the standard for concluding that an error was harmless is when a court finds that the constitutional error was "harmless beyond a reasonable doubt."  *Chapman*, 386 U.S. at 24.  In *Fry*, the Supreme Court was explicit that

> [g]iven our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief . . . it is implausible that, without saying so, AEDPA replaced the *Brecht* standard of "actual prejudice" . . . with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable doubt determination be unreasonable.  That said, it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.

---

[8]*Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710 (1993).

[9]*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967).

*Fry*, 127 S. Ct. at 2327 (internal citations omitted).[10]  The court will, therefore,

examine whether or not petitioner suffered any substantial and injurious effect under

*Brecht*.

When the issue of the Michelle Fudge statement came to light, the trial judge

issued the following instruction to the jury.

> Now [Michelle Fudge's statement] is hearsay.  Whoever this person is, Michelle Fudge, was not called into this courtroom.  None of you had the opportunity to observe her demeanor.  She was neither conducted [sic] for direct examination nor cross-examination.  Neither side had the right to confront and cross-examine her.  You do not know whether she has an axe to grind with anybody, whether she has a recollection that's good or bad.  You don't know, and I'm not, I don't know who Michelle Fudge is and I do not mean to disparage her, please don't misunderstand me.  You do not know whether she had been drinking that night or whether she has a bad memory or whether there's anything else about her ability to see, hear, know, and remember that would permit you to place any reliance upon any statement made.  Statements are not allowed in evidence absent some special rule that's applicable in terms of if they're not here to be cross-examined, then you may place no weight whatsoever and to the extent that any of you read any portion of that, you are instructed to disregard it in its entirety.  (T. 1033-34).

After polling the jury, the trial judge emphasized, "[y]ou are not to consider that at

---

[10]Some District Judges in the Northern District of New York have found that an open question exists as to whether the application of *Fry* (and *Brecht*) are "necessarily applicable in cases where no error of constitutional proportion is found to have been committed by the trial court."  *Toland v. Walsh*, 9:04-CV-773, 2008 U.S. Dist. LEXIS 704, * 56-57 n. 23 (N.D.N.Y. Jan. 4, 2008) (Sharpe, J.).  *See also, Rice v.* Senkowski, 9:04-CV-335, Dkt. No. 21, 17-18 (see *Rice v. Senkowski*, No. 04-CV-335, 2007 U.S. Dist. LEXIS 70565 (N.D.N.Y. Sept. 24, 2007) (Kahn, S.J., adopting Report-Recommendation of Magistrate Judge David E. Peebles)).  Cf. *Mileto v. Philips*, 9:03-CV-353, 2007 U.S. Dist. LEXIS 45877, *61 (N.D.N.Y. June 12, 2007) (McCurn, S.J., applying both *Brecht* and *Chapman* where no constitutional error was found in the state courts and the federal court is considering harmless error in the first instance).  In this case, a constitutional error was found and acknowledged by the state courts, thus this court need not resolve the issue.

all.  You are not to share it with anybody who did not read it.  It is irrelevant.  It's

inadmissible.  It was an honest error . . . but it's not evidence in the case . . ."  (T.

1036).

In this case, both the Appellate Division and the Court of Appeals explicitly

made findings under the "harmless beyond a reasonable doubt" framework citing

*People v. Crimmins*[11], the New York Court of Appeals case that adopted *Chapman*.

Both courts found that it was constitutional error for the jury to consider Michelle

Fudge's statement, and conducted a harmless error analysis, though with different

results.  The Court of Appeals found "no reasonable possibility that the error might

have contributed to defendant's conviction because proof of defendant's guilt,

without reference to the error, is overwhelming."  *People v. Smith*, 97 N.Y.2d at 330.

> The record reflects that defendant was given *Miranda* warnings before
> he gave the confession that was recorded by the detectives; the
> confession described the motive and method for the shootings;
> defendant provided drawings of the place where he disposed of the gun;
> and he identified the bike that he rode that early morning.  In addition,
> Detective Quatrone testified, without challenge, that he heard defendant
> confess the shooting to his mother.  Eyewitness Hunt testified that he
> saw defendant commit the crimes.

*Id*. at 330-31.

Respondent argues that the Michelle Fudge statement did not implicate

petitioner in the shooting.  (Dkt. No. 6, *Memorandum of Law*, 14).  The Court of

Appeals stated that "[d]efendant testified that he was dropped off by Michelle Fudge

---

[11]*People v. Crimmins*, 36 N.Y.2d 230, 326 N.E.2d 787 (1975).

around 2:00 A.M.  The shooting did not occur until 4:30 A.M.  Michelle Fudge's

statement contradicted [petitioner's] testimony, [but] it did not present an alibi."

*People v. Smith*, 97 N.Y.2d at 331.  When the trial judge polled the jury, no more

than six jurors acknowledged having read the statement.  (T. 1035-36).  Therefore,

on a jury of twelve people, no more than half of the jurors read the statement, and all

of the jurors were instructed to ignore the statement altogether.  The Supreme Court

has held that there is a presumption

> that a jury will follow an instruction to disregard inadmissible evidence
> inadvertently presented to it, unless there is an 'overwhelming
> probability' that the jury will be unable to follow the court's
> instructions, *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), and a
> strong likelihood that the effect of the evidence would be 'devastating'
> to the defendant, *Bruton v. United States*, 391 U.S. 123, 136 (1968).

*Greer v. Miller*, 483 U.S. 756, 767 n. 8, 107 S. Ct. 3102 (1987).  In this case, only a

portion of the jury read the statement, and the statement itself did not directly

contradict petitioner's assertion that he was home asleep when the shooting occurred.

The statement concerned only how petitioner arrived at his home hours before the

shooting.  Here, there is no overwhelming probability that the jury would be unable

to follow the trial judge's instruction, and no prejudicial effect on the petitioner.

The trial judge's instruction was strong enough to overcome any prejudice to

petitioner that might have resulted from the inadvertent inclusion of the Michelle

Fudge statement in the exhibits viewed by the jury.  Because petitioner is unable to

show any actual prejudice or substantial and injurious effect under *Brecht*,

40

petitioner's claim regarding the error during deliberations may be dismissed.  To the

extent that petitioner's claim regarding the trial judge's ruling on petitioner's motion

for a mistrial is a separate claim, that claim may also be dismissed.

## 7. **Prosecutorial Misconduct Claim**

In his sixth claim, petitioner alleges prosecutorial misconduct because the

prosecution "utiliz[ed] illegally obtained evidence that was ***extracted from***

***petitioner***[12] by the Syracuse Police Department."  (Petition ¶ 22(F)).  Petitioner is

referring to his confession.  This court found, above, that petitioner's Fifth

Amendment claim was meritless and that the state court's finding was not contrary to

---

[12]The court may only consider claims that petitioner includes in his petition.  In this case, the petition is clear that petitioner's claim is that the only evidence that was "illegally obtained" by the Syracuse Police Department is the evidence "extracted from petitioner," namely, his confession.  However, the court notes that petitioner's Section 440 motion included claims regarding the statements obtained by the Syracuse Police Department from Michelle Fudge and trial witness Abraham Whaley.  As discussed above, Michelle Fudge did not testify at trial, and her only involvement with the trial was that her statement to police was inadvertently given to the jury on the back of another exhibit.  The jury was instructed to disregard her statement.  Abraham Whaley recanted his prior statement to police during his trial testimony, and testified extensively regarding the conditions under which he gave the original statement.  The court also notes that petitioner submitted affidavits from Michelle Fudge and Abraham Whaley to the Section 440 court, recanting their earlier statements to police, and explaining that those earlier statements were given under threat of prosecution.

Petitioner has not submitted these new affidavits to this court for consideration, except as exhibits related to the Section 440 proceeding.  To the extent that this court should consider these latest affidavits *sua sponte*, or for some other reason, the court will note that Michelle Fudge's original statement, even if considered by some members of the jury against the strict instruction of the judge, did not implicate or exonerate petitioner.  Her latest affidavit does not add any new information to the events of August 30, 1998.  Additionally, Abraham Whaley's current affidavit does not present any information that was not available for the jury's consideration.  Petitioner makes no claims related to these latest affidavits in his petition to this court, but to the extent that any of his claims could be found to include allegations related to the Whaley and Fudge affidavits, this court finds that the affidavits do not provide any information that either bolsters or discredits the facts already considered by the state courts.

or an unreasonable application of federal law.  Because the confession was properly obtained, there could be no misconduct by the prosecutor in using the confession or any evidence that was obtained as a result of the confession.  Under *Darden v. Wainwright*, the Supreme Court standard for a prosecutorial misconduct claim is whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citations omitted).  The court need not reach this analysis because the underlying claim of police misconduct is without merit.

## 8.  Cumulative Effects Claim

Petitioner's last claim is that his "rights to a fair trial were violated through the cummulative [sic] effect of these errors."  (Petition ¶ 22(G)).  The court has found no constitutional errors that violated petitioner's right to a fair trial.  Therefore, there is no cumulative effect of any error that violated petitioner's right to a fair trial.


**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of*

*Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72.

Date: August 13, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge